[Cite as *State v. Domanick*, 2018-Ohio-936.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                    :
                                                                      No. 17AP-628
v.                                                     :             (C.P.C. No. 12CR-6487)

Michael P. Domanick,                     :             (REGULAR CALENDAR)

    Defendant-Appellant.                :

---

D E C I S I O N

Rendered on March 13, 2018

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

**On brief:** *Joseph F. Salzgeber*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Michael P. Domanick, appeals decisions of the Franklin County Court of Common Pleas entered on August 3 and 4, 2017, denying his post-sentencing motion to withdraw an *Alford*[1] plea, and finding violations of Domanick's community-control conditions, resulting in extending his period of community control, along with new conditions. Because we agree that there is no manifest injustice in allowing his plea to stand and because the hearing before the trial court on the revocation request demonstrated that Domanick could pay considerably more toward his arrearages than he paid, we affirm the decisions of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On December 26, 2012, a Franklin County Grand Jury indicted Domanick for felony nonsupport of dependents. (Dec. 26, 2012 Indictment.) Dominick was served with

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (1970).

the indictment approximately nine months later. (Sept. 19, 2013 Warrant Return.) He was arraigned and pled "not guilty" to the charges on September 20, 2013. (Sept. 20, 2013 Plea Form.) Approximately one year after his initial plea, following a number of changes of counsel and considerable motions practice, on November 3, 2014, Domanick entered an *Alford* plea to a single count of nonsupport of dependents with a joint recommendation of two years of community control. (Nov. 3, 2014 Guilty Plea Entry.)

{¶ 3} The plea and sentencing transcript reflects the following exchange regarding the voluntariness of his plea:

> THE COURT: Mr. Domanick, would you stand please, sir? Sir, there are a number of things that we need to talk about. If I say anything that you are not sure of or you do not understand, will you please speak up and let us know that because then we can talk until you do understand?
>
> THE DEFENDANT: Yes.
>
> THE COURT: How old are you?
>
> THE DEFENDANT: 45.
>
> THE COURT: How far have you gone in school?
>
> THE DEFENDANT: I have a college degree.
>
> THE COURT: I take it you read and write the English language?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Are you a citizen of the United States?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Here today in this courtroom are you under the influence of alcohol or any drug or prescription medication?
>
> THE DEFENDANT: No.
>
> THE COURT: Is there anything at all that is affecting your judgment?
>
> THE DEFENDANT: No.
>
> THE COURT: Has anybody threatened you or forced you to change your plea to guilty?

THE DEFENDANT:  No.

THE COURT:  Has anybody promised you anything other than what you just heard here in this courtroom that causes you to plead guilty?

[DEFENSE COUNSEL]:  Your Honor, I just want to mention we are doing the Alford plea. I know you are using the word guilty. That may be some of his hesitation.

THE COURT:  Let's deal with that right now. An Alford plea is a guilty plea, but it's a plea where you are basically saying: I'm not going to admit that I'm guilty, but I'm pleading guilty because I want to avoid a possible bad consequence that might occur if I go to trial. So it's a special kind of guilty plea, but it's a guilty plea nonetheless. And I understand that this is an Alford plea, and the record can reflect that whenever I say guilty or use that word, there is an understanding that we are talking about an Alford plea. So if that makes anything more clear or easier, then we have got that on the record.

Mr. Domanick, did you understand the things I said?

THE DEFENDANT:  Yes.

THE COURT:  Okay. Now I need to try and remember where I was in my litany.

[DEFENSE COUNSEL]:  I apologize. I think it was changing the plea.

THE COURT:  Has anybody promised you anything other than what you heard here in this courtroom that is causing you to change your plea to guilty?

THE DEFENDANT:  No.

THE COURT:  Has anybody offered to give you a bunch of money to plead guilty?

THE DEFENDANT:  No.

THE COURT:  Has anybody promised you are going to get some big prize? These are pretty simple questions.

THE DEFENDANT:  No.

THE COURT: Are you currently on probation or parole or community control or post-release control for any other criminal offenses?

THE DEFENDANT: No.

THE COURT: Has [Defense Counsel] explained everything to you and answered all your questions?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with her counsel and her advice?

THE DEFENDANT: Yes.

THE COURT: The law requires that you understand the maximum penalty that could be imposed. This is a felony of the fifth degree. The maximum sentence would be one year in prison and a fine of up to $2,500. Do you understand those penalties?

THE DEFENDANT: Yes.

THE COURT: Now, there is a recommendation from both sides here that I put you on community control -- that is what we call probation nowadays -- and that I do that for two years. I believe I intend to follow that recommendation.

Conditions will be placed upon your behavior. If you violate any of those conditions, there are basically three things that the Court could do. Your period of supervision could be extended out to five years, or different or greater restrictions could be placed on your behavior, or the community control could be revoked and you could be punished in some other fashion, not the least of which would be a year in prison and a fine of up to $2,500. Do you understand those things?

THE DEFENDANT: Yes.

THE COURT: Now, if you go to prison on this case at any point in time you would have a chance to participate in programs in the prison that could reduce your sentence. If you went to prison, at the point where you are released from the prison the Adult Parole Authority, if they choose to, can supervise your behavior on the street for three years. If that happened and you violated any condition of your release, they could send you back

to the prison for additional time and it could be up to one half of whatever the original sentence might be.

That is a mouthful. Let me give you an example. If you were sent for a year and you messed up when you got out, they could send you back for six months. If you were sent for six months, they could send you back for three months. It's always one half of the original sentence. Any questions about all of that?

THE DEFENDANT:  No.

THE COURT:  Have you understood everything so far?

THE DEFENDANT:  Yes.

THE COURT:  Sir, I have got a two-page entry of guilty plea form up here electronically. It appears to have your signature on both pages. Did you sign these forms?

THE DEFENDANT:  Yes.

THE COURT:  Did you go over the forms with [Defense Counsel] before you signed them?

THE DEFENDANT:  Yes.

THE COURT:  Do you believe you understand the things that are contained in the forms?

THE DEFENDANT:  Yes.

THE COURT:  This form is telling me, amongst other things, that you want to change your plea to guilty to this nonsupport and you do not want to have a trial. Is that accurate?

THE DEFENDANT:  Same thing?

THE COURT:  Mr. Domanick, the explanation I gave you is going to cover us all of the way to the very end.

THE DEFENDANT:  Yes. I'm sorry.

THE COURT:  This form is telling me that you want to change your plea to guilty and you do not want to have a trial. Is that accurate?

THE DEFENDANT:  Yes.

THE COURT:  And you understand what we are doing right now is not a trial?

THE DEFENDANT:  Yes.

THE COURT:  When you change your plea to guilty you give up rights guaranteed by our Constitution. I need to make certain you understand each one of these rights and that you are willing to give them up so that you can enter this guilty plea. I'm going to explain these things to you one at a time. I'll ask if you understand each explanation. At the end I'm going to ask you are you willing to give up all of these rights so that I can accept the guilty plea.

First of all your right to trial. You still have a right to a trial in this case. You could have a jury of 12 people or you could ask me to hear the case. Either way the judge or the jury would sit through the trial and listen to the evidence. Then based on that evidence a decision would be made. Either your guilt had been proven or your guilt had not been proven. Do you understand these things?

THE DEFENDANT:  Yes.

THE COURT:  During this trial you would not have to prove anything. The State of Ohio would have the burden of proof. They would need to prove you guilty beyond a reasonable doubt on every single part of this crime before a judge or a jury could say you were guilty of the crime. Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  During the trial [Defense Counsel] would have an opportunity on your behalf to confront and cross-examine any witness that would testify against you. Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  If you thought there were witnesses who could help you with your case, you could ask the Court to cause subpoenas to be issued to compel those people to come here to give testimony. Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You would have a right to remain silent during the trial. No one could force you to testify. If you would choose

to remain silent, no one could comment upon that, and your silence could not be used for any purpose. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Finally, if you thought mistakes were made during the trial, you could appeal that to a higher court, but since you're giving up your right to trial, there won't be an appeal from a trial. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: I need to make sure you understand the nature of this crime. It's called nonsupport. What nonsupport means is that a domestic court has determined that you are responsible for the child support payment of one or more children and that that court has ordered that payment and that you have failed to abide by the order. Do you understand the nature of this crime?

THE DEFENDANT: Yes.

THE COURT: And have you discussed that with counsel?

THE DEFENDANT: Yes.

THE COURT: What is your plea to nonsupport as a felony of the fifth degree?

THE DEFENDANT: Alford plea.

THE COURT: Okay. We have made a record that this is an Alford plea, so you need to change your plea to guilty if that's what you want to do.

THE DEFENDANT: I'm sorry. I heard that a lot so I assumed that is how I was supposed to say it. I'm sorry.

THE COURT: What is your plea?

THE DEFENDANT: Guilty.

(Nov. 3, 2014 Plea & Sentencing Tr. at 3-12, filed Dec. 5, 2017.) In an entry filed two days after the hearing, the trial court sentenced Domanick to two years of community control with conditions that Domanick pay his arrearages in the amount of $159,805 in regular

monthly installments of $6,661.04, with the entire balance accelerated and immediately due if he missed a payment. (Nov. 5, 2014 Jgmt. Entry at 2; State's Ex. D at 2.)

{¶ 4}  On September 26, 2016, shortly before Domanick's community-control period was due to expire, a Franklin County probation officer filed a report requesting revocation of Domanick's community control. (Sept. 26, 2016 Req. for Revocation.)  The officer noted that Domanick was ordered to pay arrearages in the amount of $159,805 and, in two years, had paid only $9,665. *Id.* at 1.  The officer also noted that Domanick had been offered the opportunity to sign an extension waiver to voluntarily extend his community control (as an alternative to a revocation proceeding) and that he declined. *Id.*  After Domanick moved to dismiss the revocation request, the probation officer filed an addendum to the statement of violations adding that Domanick had failed to provide proof of employment. (Apr. 5, 2017 Mot. to Dismiss Violation; Apr. 10, 2017 Addendum.)  Shortly thereafter, on April 13, 2017, Domanick moved to withdraw his plea. (Apr. 13, 2017 Mot. to Withdraw Plea.)

{¶ 5}  In May 2017, the trial court held a hearing on both of Domanick's motions. Both Dominick and his friend, Jennifer Esposito-Hatina, testified in support of his motions. Dominick testified that his lawyer was unprepared for trial and more interested in pleasing the court and the State than in representing him. (May 11, 2017 Hearing Tr. at 15, 17, filed Oct. 13, 2017.)  Despite the fact that he told his attorney he would not plead guilty under any circumstances, the attorney, her husband, and another man, pressured him into pleading guilty by telling him he had no defense and that if he testified in a way that was critical of the Franklin County court system he would be dealt with severely. *Id.* at 16, 21-22.  He explained that he pled guilty because he was scared about what would happen to him, not because he actually had committed the offense. *Id.* at 25.  When confronted with the court's plea colloquy quoted above, he said he was merely answering as his lawyer had instructed him to answer and not telling the truth. *Id.* at 26.

{¶ 6}  Esposito-Hatina testified that she was present with Domanick on the day of his *Alford* plea and heard Domanick's attorney admit that she had not subpoenaed anyone and did not feel it was necessary to have done so. *Id.* at 30.  At one point, while Domanick was using the restroom, Domanick's attorney told her that Domanick was not listening to anyone, that he was going to go to jail, and that he needed to accept a plea. *Id.* at 30-31.

Esposito-Hatina recounted that Domanick's attorney was insistent that he plead guilty and the attorney's argument with Domanick escalated until the attorney was yelling at him, to the effect that if he insisted on having a trial he would end up in jail. *Id.* at 31-32. Esposito-Hatina concluded that Domanick pled because he was afraid. *Id.* at 32.

{¶ 7} Two probation officers testified at Domanick's revocation hearing, the first testifying that she was responsible for Domanick's case until February 2016, at which time a second officer took over. *Id.* at 63. The first officer testified that Domanick's demeanor when registering with the probation department suggested he was not taking the matter seriously. *Id.* at 60-61. This was confirmed, she said, when he made payments of only $50 per month even though his arrearage, if split into monthly payments for the 24-month probation period called for payments of approximately $6,661 per month. *Id.* at 57, 63. This officer testified that Domanick made a $50 payment in December 2014, a $1,250 payment in January 2015, and thereafter paid only $50 to $100 per month until February 2016. *Id.* at 64-65; *see also* State's Ex. F. She also testified that a letter that purported to be from Domanick's accountant stating that he was self-employed was insufficient employment verification in her estimation but admitted she did not follow up with the accountant. (May 11, 2017 Hearing Tr. at 66-69; State's Ex. G.)

{¶ 8} The second officer confirmed that she became the Franklin County probation officer in charge of Domanick's case in February 2016 (he apparently also had a local Cuyahoga County probation officer with whom he dealt directly). (May 11, 2017 Hearing Tr. at 77.) She testified that Domanick told her that her predecessor officer had said that it was not necessary to pay the full amount due each month as long as he paid at least some amount. *Id.* at 78. The new officer told Domanick to make full payments, and, after she took over, Domanick made more satisfactory payments that were closer to what was necessary to meet the terms of his probation. *Id.* at 78-79. According to testimony identifying documentation of Domanick's payment history (State's Ex. F), Dominick made monthly payments from March[2] to October 2016 of $1,000 to $1,238 per month. (State's Ex. F at 1.) However, as he neared the end of his community-control period with his total arrearage still being high, the probation officer proposed a one-year extension of his period

---

[2] March's payment was actually made in late February. (State's Ex. F at 1.) That is, in February 2016, Domanick made two payments, one near the beginning of the month for $100, and one near the end for $1,238. *Id.*

of community control to give him more time to meet the requirements imposed by the court. The probation officer also informed him that the one-year extension would permit subsequent, one-year extensions up to the five-year maximum period that could be imposed. (May 11, 2017 Hearing Tr. at 79-81.) When Domanick refused to agree to extend his period of community control, the probation officer filed with the court a request for revocation of his community control. *Id.* at 82-83. Thereafter, starting in November 2016, Domanick reduced the amounts of his monthly payments, paying only $200 to $250 per month instead of $6,661.04 as ordered by the court. (State's Ex. F at 1.) The probation officer also agreed that Domanick's employment verification was unsatisfactory but, like her predecessor, did not seek more definitive proof of Domanick's employment. (May 11, 2017 Hearing Tr. at 84-85.)

{¶ 9} Domanick testified that he could not pay $6,600 per month and that he made that clear to the probation officers. *Id.* at 87. According to Domanick, the officers (particularly his local officer in Cuyahoga County) told him to just be sure he paid at least $50 per month. *Id.* at 87-88, 91-92. Domanick testified that the felony conviction made it difficult for him to make commissions for insurance sales and continue the white-collar work in which he had formerly been employed. *Id.* at 88-89. He also stated that he was experiencing financial hardship, was behind on his house payments and taxes, had not paid his attorney, and had a tax lien on his house. *Id.* at 92-93. Nonetheless, he admitted that he reacted very negatively when asked to agree to an extension of his community control. *Id.* at 94. Esposito-Hatina testified in support of Domanick that she believed he made regular minimum payments but did not have personal knowledge of that fact. *Id.* at 108-09.

{¶ 10} The court continued its hearing to August 3, 2017, at which time it announced from the bench its decisions and supporting reasons on Domanick's motions to withdraw his plea and to dismiss the request to revoke community control. The court stated that Domanick's motion to withdraw his plea was not based on any bona fide defense to the charge or manifest injustice in having been adjudged guilty but, rather, a reaction to the Franklin County Probation Department's decision to seek a revocation. (Aug. 3, 2017 Hearing Tr. at 4-5, filed Oct. 13, 2017.) The trial court noted that Domanick's payments toward his obligations were well below even his former monthly child support obligation of

$1,237.69 and that he only had paid $9,665 in two years, leaving an outstanding arrearage of $150,698.52. *Id.* at 6.  The trial court found that Domanick seemed resistant to its sanctions. *Id.* at 7.  It noted that when Domanick was told to increase his payments in February 2016, he very substantially did, showing he was financially able to do so. *Id.* at 8. The trial court summed up: "[B]ased on the evidence presented at the hearing, including the fact that the Defendant owns a home and has demonstrated ability to make payments when he chooses to, the Court finds that the Defendant has not complied with the community control sanction." *Id.* at 9.  Nevertheless, the trial court declined to revoke the community control and send Domanick to jail and, instead, extended community control by two years with the requirement that Domanick pay $1,013.42 per month. *Id.* at 9-10; *see also* Aug. 3, 2017 Entry; Aug. 4, 2017 Entry.  The trial court entered judgment to this effect in two entries, filed on August 3 and 4, 2017. (Aug. 3, 2017 Entry; Aug. 4, 2017 Entry.)

{¶ 11} Domanick now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 12} Domanick asserts two assignments of error for review:

> [1.] THE TRIAL COURT ERRED BY DENYING DEFENDANT-APPELLANT'S MOTION TO WITHDRAW HIS PREVIOUSLY-ENTERED ALFORD PLEA, WHERE HE WAS PRESSURED AND THREATENED BY HIS UNPREPARED DEFENSE COUNSEL TO ENTER A PLEA INSTEAD OF GOING TO TRIAL.
>
> [2.] THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FINDING THAT DEFENDANT-APPELLANT VIOLATED A TERM OF HIS COMMUNITY CONTROL BECAUSE THE APPELLEE STATE OF OHIO FAILED TO PRESENT SUBSTANTIAL EVIDENCE TO SUPPORT ITS CLAIM OF A COMMUNITY CONTROL VIOLATION AND BECAUSE SUCH A FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III.  DISCUSSION

### A.  First Assignment of Error — Whether the Trial Court Erred in Denying Domanick's Post-Sentencing Motion to Withdraw his Plea

{¶ 13} When a defendant seeks to withdraw his or her guilty plea after sentence is imposed, the court "may set aside the judgment of conviction and permit the defendant to withdraw his or her plea" in order "to correct manifest injustice." Crim.R. 32.1; *see also*

*State v. Reeder*, 12th Dist. No. CA2013-05-075, 2014-Ohio-2233, ¶ 23. The accused has the burden of showing a manifest injustice warranting the withdrawal of a guilty plea. *State v. Smith*, 49 Ohio St.2d 261 (1977), paragraph one of the syllabus. "The decision whether to hold a hearing on a postsentence motion to withdraw guilty plea and whether to grant or deny the motion is left to the discretion of the trial court." *State v. Chandler*, 10th Dist. No. 13AP-452, 2013-Ohio-4671, ¶ 8, citing *Smith* at paragraph two of the syllabus. "Although an abuse of discretion is typically defined as an unreasonable, arbitrary, or unconscionable decision, we note that no court has the authority, within its discretion, to commit an error of law." (Citations omitted.) *Chandler* at ¶ 8, citing *State v. Beavers*, 10th Dist. No. 11AP-1064, 2012-Ohio-3654, ¶ 8; *State v. Beechler*, 2d Dist. No. 09-CA-54, 2010-Ohio-1900, ¶ 70.

{¶ 14} Crim.R. 32.1 does not place a temporal limitation on correcting "manifest injustice" through setting aside a conviction after sentencing to permit the withdrawal of a guilty plea. *State v. Bush*, 96 Ohio St.3d 235, 2002-Ohio-3993, ¶ 14. But, a court may consider timing in exercising its discretion whether to allow a defendant to withdraw his or her plea post-sentencing because " 'undue delay between the occurrence of the alleged cause for withdrawal of a guilty plea and the filing of a motion under Crim.R. 32.1 is a factor adversely affecting the credibility of the movant and militating against the granting of the motion.' " *Id.*, quoting *Smith* at paragraph three of the syllabus; *see also State v. Crankfield*, 7th Dist. No. 13 MA 122, 2014-Ohio-2624, ¶ 9, fn. 1.

{¶ 15} We find no abuse of discretion or legal error in the trial court's analysis. The trial court found that Domanick's motion to withdraw his plea was timed with his response to the request for revocation. (Aug. 3, 2017 Hearing Tr. at 4-5.) Other than his systemic objection to paying child support, Domanick has never articulated any reason why he is not guilty of the offense to which he pled. His and his friend's testimony about the behavior of his attorney does not square with his prior testimony at his plea hearing in which he indicated that no one had threatened or coerced him into changing his plea and that he was satisfied with the performance of his counsel. *Compare* Nov. 3, 2014 Plea & Sentencing Tr. at 4-6 *with* May 11, 2017 Hearing Tr. at 21-25. And it is entirely possible, assuming Domanick testified truthfully, that his attorney's conclusion was correct that he had no real

defense and could land in jail or prison after a trial instead of obtaining the benefit of a jointly recommended plea and sentence of community control had he not pled guilty.

{¶ 16} A sentence of incarceration would not by its nature or operation of law erase Domanick's child support obligation arrearages. So being incarcerated as opposed to receiving a sentence of community control for his crimes would have presented no conceivable benefit to Domanick. Though it is not appropriate to punish defendants for exercising their constitutional rights associated with a trial on indicted crimes, it is permissible (and common) during plea negotiation for the State to offer a recommendation of a lesser sentence than the State would seek if forced to undergo the expense and inconvenience of a trial. *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, ¶ 8-18. Similarly, it is common for a judge to accept a joint recommendation that may be somewhat more lenient than the judge would otherwise be inclined to impose for such an offense after hearing all the evidence in a trial and seeing the full impact of a defendant's misconduct. *Id.* at ¶ 14.

{¶ 17} In short, there is no manifest injustice to be corrected based on the bare, asserted fact that Domanick's attorney told him he would be incarcerated if he did not take a plea deal. Nor does this evidence support an inference that Domanick's rights were violated or that he was improperly coerced into pleading guilty rather than going to trial. Pleading guilty via a plea deal for a recommended sentence because one fears the unknown outcomes and consequences of a trial is why many defendants plead guilty and doing so without admitting guilt is exactly the point of an *Alford* plea. *North Carolina v. Alford*, 400 U.S. 25, 26-31, 37-38 (1970). Domanick did not present the trial court with evidence to support the exercise of discretion to permit withdrawing a guilty plea after sentencing to correct manifest injustice. The trial court did not abuse its discretion in refusing to allow Domanick to withdraw his *Alford* plea. Ohio Crim.R. 32.1; *Chandler* at ¶ 8.

{¶ 18} We overrule Domanick's first assignment of error.

### B. Second Assignment of Error – Whether the Trial Court Erred in Finding that Domanick had Violated the Terms of Community Control

{¶ 19} This Court has previously explained that:

> The privilege of probation[3] rests upon the probationer's compliance with the conditions of probation and any violation

---

[3] For the purposes of this discussion, "probation" and "community control" are synonymous.

> of those conditions may properly be utilized to revoke the privilege.  In a probation violation proceeding, the state need not prove the violation beyond a reasonable doubt. Rather, substantial evidence that a probationer willfully violated the terms of his or her probation is sufficient to support the revocation of probation.   The decision whether to revoke probation rests within the sound discretion of the trial court.

(Citations omitted.) *State v. Mason*, 10th Dist. No. 01AP-847, 2002-Ohio-2803, ¶ 20, citing *State v. Bell*, 66 Ohio App.3d 52, 57 (5th Dist.1990); *State v. McKnight*, 10 Ohio App.3d 312, 313 (12th Dist.1983); *State v. Mingua*, 42 Ohio App.2d 35, 40 (10th Dist.1974); *see also, e.g.*, *State v. Hand*, 10th Dist. No. 15AP-916, 2016-Ohio-582, ¶ 10.

{¶ 20}  Some courts, including this District, have "recognized that ' "[i]t is a violation of the Equal Protection Clause of the U.S. Constitution to revoke a defendant's probation simply because she is too poor to pay restitution where the record contains no evidence that the failure to pay, was willful or intentional or that failure to obtain employment, in order to pay was willful or intentional." ' " *Hand* at ¶ 19, quoting *State v. Burgette*, 4th Dist. No. 13CA50, 2014-Ohio-3483, ¶ 12, quoting *State v. Wolfson*, 4th Dist. No. 03CA25, 2004-Ohio-2750, ¶ 20.  In Domanick's case, he was before the trial court for disobeying an order of a different court whose job it was to judicially administer a statutory policy of the state that parents must financially support their minor children.

{¶ 21} While Domanick may disagree with the other court's order, there is no dispute that he was ordered to pay the sums for which he was found to be in arrears.  There is likewise no dispute that he pled guilty to not paying court-ordered child support and that he was ordered by the trial court, as a condition of community control, to pay his arrearages in the combined amount of $159,805. (Nov. 5, 2014 Jgmt. Entry at 2.)  And there is no dispute that Domanick did not pay that amount or an amount even close to it.  Rather, evidence was presented that Domanick was capable of paying substantially more than the $50 to $100 he paid per month for many of the months he was on probation. (May 11, 2017 Hearing Tr. at 64-65; State's Ex. F.)

{¶ 22} The record is rife with evidence of this. While serving his sentence of community control, Domanick paid more toward his child support arrearages when he was expressly told to, but he paid less after he refused an offer to extend his community control beyond two years and after a request for revocation was filed. (May 11, 2017 Hearing Tr. at

78-79; State's Ex. F.)   Consistent with the evidence, the trial court expressly found that Domanick had "demonstrated [the] ability to make payments when he chooses to" and that, rather than revocation, the appropriate course was to extend community control and require payments of at least the level that the defendant had demonstrated he was capable of making: $1,013.42. (Aug. 3, 2017 Hearing Tr. at 9-10; Aug. 3, 2017 Entry; Aug. 4, 2017 Entry.)   The trial court did not abuse its discretion.   Rather, in our view, the trial court exercised the type of judgment called for by those who possess discretion to fashion remedies to achieve justice.

{¶ 23}  We overrule Domanick's second assignment of error.

## IV.  CONCLUSION

{¶ 24}  The trial court did not abuse its discretion in refusing to permit Domanick to withdraw his guilty plea post-sentence and in extending Domanick's period of community control for him to meet his obligation imposed by another court to financially support his children.  We affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and KLATT, JJ., concur.